## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | )  Criminal No. 18cr 10443 |
| | ) |
| v. | )  Violation: |
| | ) |
| ERIC LANDIS, | ) |
| | )  Count One: Securities Fraud; Aiding |
| Defendant | )  and Abetting |
| | )  15 U.S.C. §§ 78j(b) and 78ff; |
| | )  17 C.F.R. § 240.10b-5; 18 U.S.C. § 2 |
| | ) |
| | ) |
| | )  Forfeiture Allegation: |
| | )  18 U.S.C. § 981(a)(1)(C) and |
| | )  28 U.S.C. § 2461(c) |

### INFORMATION

At all times relevant to this Information:

### General Allegations

1.  The defendant, ERIC LANDIS ("LANDIS"), was a resident of Charlottesville, Virginia.

2.  Ridgeview Capital Partners ("Ridgeview") was incorporated in Virginia in 2003. LANDIS was the sole owner of Ridgeview.

3.  "Penny" or "microcap" stocks are securities issued by small, publicly traded companies that typically trade at less than $5 per share, and often less than $1 per share. Penny stocks typically are not listed on organized securities exchanges such as the New York Stock Exchange or NASDAQ Stock Market, but rather are traded on the over-the-counter ("OTC") securities market. Such stocks are particularly susceptible to manipulative trading and other forms of fraud because, among other things, they are often thinly traded and their free-trading

shares may be controlled by a single individual or group of individuals (a "control group"), often through third party or "nominee" shareholders.

4.      A "pump-and-dump" scheme typically involves the artificial inflation of the stock price and/or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's free-trading shares, can profit by secretly selling their shares to other investors (the "dump").

5.      Generally, pump-and-dump schemes effect the artificial inflation of stock prices and trading volume through, among other things, the issuance of news releases and promotional materials—often containing false, misleading, or exaggerated claims about the companies' potential, or predicting unrealistic stock price targets—and through manipulative trading designed to generate the appearance of demand for the shares.  Such schemes often rely on paid promotional campaigns to disseminate false and misleading information through emails, newsletters, hard mailers and social media outlets.

6.      Wash trades and matched trades are forms of manipulative trading designed to increase stock prices and create the appearance of demand.  Wash trades are purchases and sales of securities that correspond to each other in price, volume, and time of execution and involve no change in beneficial ownership.  Matched trades are similar to wash trades but involve a related third party who places one side of the trade.

7.      The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government.  The SEC is responsible for enforcing the federal securities laws and promulgating rules and regulations concerning the federal securities laws.  Among other things, federal securities laws, regulations and rules are designed to protect

the investing public by maintaining fair and honest securities markets and eliminating manipulative practices that tend to distort the fair price of securities.

Scheme to Defraud

8.      From at least January 2015 through in or about January 2018, LANDIS claimed to have access to proprietary lists of thousands of potential investors, to whom he could send email "blasts" promoting securities and thereby generating increased trading volume in their shares. LANDIS marketed these purported services to multiple third parties, including individuals involved in pump-and-dump schemes.  During this period, LANDIS was paid approximately $3.3 million to promote more than 90 publicly traded companies through the use of LANDIS's email distribution lists.

9.      In fact, LANDIS's email distribution lists contained far fewer investors than he claimed.  Instead, to generate the increased trading volume that he had promised, LANDIS engaged in various forms of manipulative trading, including matched trading and wash trading of the securities he was paid to promote.

10.     Specifically, LANDIS controlled multiple brokerage accounts held in his own name, as well as in the names of a relative, a business associate, and a purported corporate entity, Ridgeview Capital Partners (collectively, the "LANDIS ACCOUNTS").

11.     LANDIS had online access to the LANDIS ACCOUNTS, and LANDIS used these accounts to place buy and sell orders for the securities he was paid to promote.

12.     LANDIS engineered coordinated trades between and among the LANDIS ACCOUNTS, including approximately 1,300 matched trades involving approximately 97 securities, as part of an effort to increase the trading volume of those securities and create the appearance of demand for the shares.

3

*Interactive Multi-Media Auction Corp (March – April 2015)*

13.     For example, commencing in approximately March 2015, a third party paid LANDIS to promote a microcap company called Interactive Multi-Media Auction Corp. ("Interactive").  The third party agreed to pay LANDIS $10,000 per day to promote the stock through the use of one of LANDIS's email lists, "The Street Alert," and $5,000 per day to promote the stock through another of LANDIS's e-mail lists, "The Penny Reporter."

14.     Instead of sending out the e-mail blasts, however, LANDIS engaged in matched and wash trading amongst the LANDIS ACCOUNTS in order to generate the appearance of demand for Interactive shares.

15.     On or about April 28, 2015, for example, LANDIS used the LANDIS ACCOUNTS to buy 17,050 shares of Interactive, while simultaneously selling 15,200 shares. LANDIS executed the trades in blocks of a few thousand shares at a time.  On that day, LANDIS's trades comprised approximately 51 percent of the total trading volume in shares of Interactive.

16.     On or about the next day, April 29, 2015, LANDIS again engaged in manipulative trading, including matched and wash trading, among the LANDIS ACCOUNTS, and his trading generated approximately 42 percent of the total trading volume in Interactive.

*Agora Holdings (September 2016)*

17.     Similarly, in or about September 2016, LANDIS was paid approximately $59,000 to promote the stock of Agora Holdings ("Agora") through his e-mail distribution lists.

18.     Instead, LANDIS engaged in matched trading and wash trading of Agora's shares.  As an example, on or about September 15, 2016, LANDIS used the LANDIS

ACCOUNTS to buy and sell matched orders of Agora stock, single-handedly generating approximately 26 percent of the total trading volume in the stock that day.

19.     On or about September 26, 2016, LANDIS again used the LANDIS ACCOUNTS to buy and sell Agora stock, thereby generating approximately 41 percent of the total trading volume in Agora that day.

20.     On or about September 28, 2016, LANDIS again used the LANDIS ACCOUNTS to buy and sell Agora stock, generating approximately 53 percent of the total trading volume in Agora that day.

COUNT ONE
Securities Fraud; Aiding and Abetting
(15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

21.     The U.S. Attorney re-alleges and incorporates by reference paragraphs 1 through 20 of this Information as if fully set forth herein, and further charges that:

22.     From at least January 2015 through in or about January 2018, in the Western District of Virginia and elsewhere, the defendant,

ERIC LANDIS,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, manipulative trading of approximately 97 publicly traded companies in order to create the false appearance of demand for the shares.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

6

## FORFEITURE ALLEGATION
### 18  U.S.C. § 981(a)(1) and 28 U.S.C. § 2461(c))

23.    The U.S. Attorney re-alleges and incorporates by reference paragraphs 1 through 20 of this Information as if fully set forth herein.

24.    Upon conviction of the offense in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 as set forth in Count One of this Information, the defendant,

### ERIC LANDIS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.  The property to be forfeited includes, but is not limited, to the following asset:

      a.    A forfeiture money judgment equal to the amount of proceeds the Defendant obtained as a result of his offense, to be determined by the Court at sentencing;

25.    If any of the property described in Paragraph 24 above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    have been transferred or sold to, or deposited with, a third party;

      (c)    have been placed beyond the jurisdiction of the Court;

      (d)    have been substantially diminished in value; or

      (e)    have been commingled with other property which cannot be divided without difficulty;

7

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 24 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:

ERIC S. ROSEN
Assistant U.S. Attorney

Date: November 27, 2018